# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

CITY OF DAYTON, OHIO,
101 West Third Street
Dayton, OH 45402,

   Plaintiff,

  v.

UNITED STATES OF AMERICA,
c/o Dominick S. Gerace II, U.S. Attorney
U.S. Attorney's Office for the Southern
District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, OH 43215,

   Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 1 : 26-cv-178 _____

Judge _____

Magistrate _____

**COMPLAINT FOR (1) COST-RECOVERY, ENFORCEMENT OF FEDERAL FACILITY AGREEMENT, AND DECLARATORY RELIEF UNDER CERCLA (42 U.S.C. §§ 9601 *et seq.*), AND (2) COST-RECOVERY, ENFORCEMENT, AND DECLARATORY RELIEF UNDER SDWA (42 U.S.C. §§ 300f *et seq.*)**

## INTRODUCTION

1.   Now comes the Plaintiff, City of Dayton, Ohio ("the City" or "Dayton") to file this Complaint under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA") against the United States:

  a.   To recover response costs incurred by the City to address contamination of Dayton's drinking water supply (including its wellfield and surrounding property, production and monitoring wells, and untreated and treated waters) with per- and poly-fluoroalkyl-based substances ("PFAS") disposed of at, and otherwise released at, the U.S. Department of the Air Force's Wright-Patterson Air Force Base ("WPAFB" or "the Base"), addressed at 88th Air Base Wing, Wright-Patterson Air Force Base, 5135 Pearson Road, Wright-Patterson AFB, Ohio 45433;

  b.   To obtain a declaration of WPAFB's obligation to reimburse Dayton's future response costs to continue its response to the PFAS contamination of its water supply; and

  c.   To obtain injunctive relief and an order for payment of civil penalties for

ongoing violations of the Federal Facility Agreement ("FFA") signed by WPAFB in March 1991 under Section 120 of CERCLA, 42 U.S.C. § 9620, and ongoing violations of CERCLA's National Contingency Plan ("NCP"), 40 C.F.R. Part 300, incorporated into the FFA, for not taking the steps required under the FFA and the NCP to address the contamination of the City's water supply.

2. Dayton also files this Complaint under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f *et seq*., to obtain injunctive and declaratory relief, and an order for payment of civil penalties, for ongoing violations by WPAFB for (a) not taking emergency actions required under orders issued by Ohio EPA under its delegated SDWA program to stop the PFAS contamination at the Base from continuing to migrate into the City's production wells and water supply, and (b) not complying with the City's Wellfield Protection Ordinance (WPO), which separately mandates that the Base take these emergency steps, and also reimburse the response costs incurred by the City as a result of the contamination of its water supply.

**SUMMARY OF DAYTON'S EFFORTS TO CONVINCE WPAFB TO TAKE THE
NECESSARY STEPS TO ADDRESS ITS CONTAMINATION
OF THE CITY'S WATER SUPPLY**

3. As of the date of filing of this Complaint, WPAFB has taken no steps to stop or limit a massive plume of PFAS-contaminated groundwater from continuing to migrate from the Base's property into the City's wellfield and water supply, despite (a) knowing that PFAS contamination of groundwater at the Base had migrated into the City's production wells and water supply as far back as early 2016 and continues to do so today, (b) receiving multiple orders from Ohio EPA in 2016 and 2018 to take steps immediately to stop the migration, and (c) receiving three separate letters in 2020, 2021, and 2024 from Ohio Governor DeWine (2020 and 2021) and former U.S. Senator Brown (2024), respectively, urging the Base to sign a cooperative agreement with the City[1] and take

---

[1] Section 332 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law No. 116-92, available at https://www.congress.gov/bill/116th-congress/senate-bill/1790, last accessed 12/29/25) required that, when requested

emergency steps to stop the migration and fund treatment of the City's drinking water.

4. Faced with mounting years of WPAFB's inaction, on March 31, 2021, the City submitted to WPAFB a formal citizen-suit notice letter under several federal environmental statutes, including the SDWA, informing the Base that it was in violation of these statutes, including its ongoing failure to comply with Ohio EPA's emergency orders and the City's WPO, and providing documentation of each violation, and also stating that unless WPAFB took steps immediately to come into compliance Dayton would file suit to obtain injunctive relief and an order for payment of civil penalties. A true and accurate copy of Dayton's March 31, 2021, letter, without the supporting documentation, is enclosed as Exhibit A. *WPAFB did not respond to the City's letter*.

5. WPAFB has also not agreed to pay for, reimburse, or otherwise offer to share ***any*** portion of, millions of dollars in ongoing emergency response costs incurred by the City to address the impact on the City's water supply from the release of PFAS at the Base, not offering to do so even after U.S. EPA issued new rules in April 2024 designating PFAS as hazardous substances under CERCLA, 42 U.S.C. § 9602, and establishing stringent part-per-trillion drinking water standards for PFAS under the SDWA, 42 U.S.C. § 300g-1.

6. In response to the publication of these two rules, on February 25, 2025, Dayton submitted to DOJ and WPAFB a second letter, this time a detailed cost-recovery demand (a) summarizing the City's emergency response action steps and associated costs incurred as of that date, totaling more than $14 million, along with supporting documentation, and (b) requesting that WPAFB enter into a cooperative agreement with the City to reimburse its ongoing and future emergency response costs, and work collaboratively with the City to design, fund and install a PFAS

---

by the Governor of a State, the Secretary of Defense shall enter into a cooperative agreement for testing, monitoring, removal, and remedial actions to address contamination of drinking water from PFAS originating from activities of the Department of Defense.

treatment system to enable the City to meet U.S. EPA's June 2029 deadline to comply with the new drinking water standards for PFAS. A true and accurate copy of Dayton's February 25, 2025, letter, without the supporting documentation, is enclosed as Exhibit B. *WPAFB did not respond to the City's second letter.*

7. The same PFAS release that has contaminated, and continues to migrate into, the City's water supply also contaminated the groundwater that WPAFB treats and supplies for drinking to its own approximately 30,000 employees, contractors, and military residents. For them, acting pursuant to clear, unequivocal emergency obligations set forth in the March 1991 FFA, WPAFB moved expeditiously to secure funding from Congress to design and install in mid-2017 a granular activated carbon treatment system to remove PFAS from the groundwater. A true and accurate copy of the March 1991 FFA is enclosed as Exhibit C.

8. However, over the ensuing eight plus years, for the City of Dayton's contaminated water supply, which serves close to 400,000 residents, businesses and contract customers, WPAFB has steadfastly refused to take the same mandatory emergency steps in the FFA to secure funding to design and install either (a) a system to treat the contaminated groundwater that continues to migrate from the Base into the City's wellfield, or (b) a system to treat the City's finished water before it is distributed to residents and customers. The Base's refusal to take these steps continued even after it was informed by U.S. EPA Region 5 in a December 16, 2024, letter (available at https://ar.cce.af.mil/ViewPdf?id=640084&token=HsNJUER%2BvHE5Wpg3WYDFNT%2F8eHs1 YhA1M8fcy9YDMtc%3D, last accessed 12/29/25) that the Agency had determined that *uncontrolled groundwater migration of PFAS from WPAFB had created unacceptable human health risks due to exceedances of the new drinking water standards for PFAS.*

9. Faced with yet more years of WPAFB's inaction, on June 3, 2025, Dayton sent a

third letter to the Base, this time informing it that unless it immediately complied with its obligations under the FFA the City would file a citizen-suit under 42 U.S.C. § 9659 of CERCLA to obtain injunctive relief and an order for payment of civil penalties for ongoing violations of the FFA and CERCLA's NCP, which is incorporated into the FFA. A true and accurate copy of Dayton's June 3, 2025, letter, without the supporting documentation, is enclosed as Exhibit D. *As it did with respect to the City's first two letters, WPAFB did not respond to the City's third letter.*

10.     Despite a longstanding relationship between the City of Dayton and WPAFB, and the City's acknowledgment of the Base's important role in the local economy, WPAFB's almost 10 years of inaction (a) has significantly jeopardized Dayton's ability to meet the June 2029 deadline to comply with the new PFAS drinking water standards; (b) has significantly increased the risk that substantial rate increases will have to be imposed on Dayton's residents, businesses and contract water customers to meet the City's obligation to fund, design and install a treatment system to remove PFAS from the water supply; and (c) has cost the City well in excess of $14 million so far in emergency response costs to address the contamination of the City's wellfield and water supply, with an estimated capital expense of more than $300 million looming on the horizon to design, install and operate a treatment system. These are risks and unreimbursed costs that the City of Dayton can no longer afford to ignore.

**THE PARTIES**

11.     Plaintiff, City of Dayton, is an Ohio municipal corporation with its principal office located at 101 West Third Street, Dayton, OH 45402.

12.     Defendant, United States, is responsible for the U.S. Department of Defense and its armed services branches, including the U.S. Air Force and its Air Bases, including WPAFB. WPAFB is operated by the U.S. Air Force, a branch of the U.S. Department of Defense, and is

located adjoining the northeast boundary of Dayton, Ohio, with operations in both Montgomery and Greene Counties, Ohio. Under Rule 4(i) of the Federal Rules of Civil Procedure, Defendant's address for service is the U.S. Attorney's main office for the Southern District of Ohio, 303 Marconi Boulevard, Suite 200, Columbus, OH 43215.

## BACKGROUND FACTS

13. Dayton provides potable water to close to 400,000 residents, businesses, and contract water customers. The City's service area includes most of Montgomery County, Ohio, including the Cities of Dayton, Kettering, Riverside, Centerville, Trotwood, and Brookville, and Harrison Township; customers in Greene County, Ohio; and service to the Dayton International Airport as well.

14. The City's distribution lines extend over 50 square miles and carry an average of approximately 70 million gallons each day. The City's Water Department operates wellfields in the Great Miami River and Mad River basins that include production wells supplying groundwater to two water treatment plants, one lime reclamation facility, two main pumping stations, six booster pumping stations. and eleven water storage facilities. Surrounding the City's production wells are hundreds of early-detection monitoring wells ("monitoring wells") installed to detect potential contaminants in groundwater that may be migrating into the capture zone of the production wells.

15. WPAFB's operations are located immediately upgradient of the City's Mad River wellfield. In some locations, the Base's operations are less than 1000 feet from the nearest City production well, and much closer than that from numerous early-detection monitoring wells installed by the City.

16. Dayton relies solely on groundwater for its source of drinking water. There is no other source if the aquifer becomes contaminated and unusable. In order to protect the aquifer, the

City successfully petitioned U.S. EPA in 1988 to designate the aquifer as a "sole source aquifer" under Section 1424 of the SDWA (42 U.S.C. § 300h-3), the first such designation in the Midwest. Such designation required the City to develop wellhead protection zones surrounding the Mad River and Miami River wellfields, and to adopt a wellfield protection ordinance (WPO), the combination of which, among other obligations, puts limits and monitoring requirements on the use of chemicals inside the protection zones. Most of WPAFB's operations lie inside the City's wellhead protection zones. The sole source aquifer that provides drinking water to Dayton also serves as the sole source of drinking water for close to three million other residents and businesses in Southwestern Ohio, making it one of the largest sole source aquifers in the nation.

17. WPAFB's records indicate that it began using PFAS-containing firefighting liquids and foams in 1970 to extinguish aviation fuel-based and oil-based fires, and to conduct firefighting training exercises. Upon information and belief, thousands of gallons of PFAS-containing liquid concentrates were stored each year at the Base and used for decades in fire suppression hanger and mobile systems, and in regular firefighting training exercises. WPAFB's use of these liquids and foams occurred under circumstances where little or no steps were taken to minimize the potential for significant spills, and for routine disposal of the liquids and residues onto the ground and surrounding soils, and running off into nearby surface waters and drainage areas. For example, one documented release was estimated to be 50,000 gallons of liquid into a storm drain at the Base.

18. Beginning as early as 1973, information became known to, or at least readily available to, WPAFB, indicating that PFAS were toxic and environmentally persistent. For example, in 1973 the U.S. Air Force issued a report finding that the PFAS solutions were toxic to aquatic life and not biodegradable, and stating that Air Command environmental coordinators expressed concern for disposing of residues after use. In 1974 the U.S. Air Force issued another report confirming these

findings and recommending that wastewaters and residues from firefighting operations be collected and treated before discharge.

19. In March 2011 the DOD's Materials of Emerging Regulatory Interest Team issued Risk Alert # 03-11 to all military branch environmental coordinators stating, among other things, that (a) the discharge of these liquids and foams was regulated under the federal Clean Water Act; (b) potential liability for the release of PFAS needed to be weighed against the cost of disposal and resupply with alternative chemicals; (c) uncontrolled, repeated application of PFAS-containing liquids and foams could be expected to contaminate soil and groundwater, and thus such activities needed to be managed; and (d) containment, treatment, and proper disposal of such releases through the use of lined pits and improved wastewater treatment were recommended.

20. A report prepared on behalf of WPAFB in 2015 concluded that spills and other releases of PFAS at WPAFB had contaminated 25 different areas at the Base, including areas located immediately upgradient of the City's Mad River wellfield that were so significant in scope that WPAFB's consultant stated that it warranted the highest "Group 1" classification, denoted as "high mass…released and probability of groundwater contamination."

**DAYTON'S RESPONSE TO THE RELEASE OF PFAS AT WPAFB**

21. In early 2017, the City began detecting PFAS in finished water at its Ottawa water treatment plant, as well as in monitoring and production wells located in (a) the Huffman Dam area of the Mad River wellfield, which is located directly adjacent to the fenceline of Area A at the Base, and (b) the Rohrers Island area of the Huffman Dam wellfield, which is located south/southwest and directly downgradient from Area B at the Base. At the request of Ohio EPA, Dayton undertook several initial emergency steps. First, the City shut down seven production wells in the Huffman Dam area closest to WPAFB in an effort to reduce PFAS concentrations entering the Ottawa

treatment plant, resulting in the loss of more than 33% of the production capacity from the Mad River wellfield. Second, an additional production well was subsequently shut down in the Rohrers Island area of the wellfield due to the detection of PFAS migrating from Area B at the Base. These eight production wells have remained out of operation for periods ranging from five to almost eight years, representing almost 50% of the current daily production of the entire Mad River wellfield.

22.     The City then began regular testing for PFAS in the monitoring wells located between the production wells and Areas A and B at WPAFB. Dayton also installed more than 150 additional monitoring wells distributed across the City's source water protection area, in order to (a) increase the ability to detect the migration of PFAS and associated pathways for contaminated groundwater leaving the Base and entering into the cone of influence for the City's production wells, and (b) begin to assess the mass loading of PFAS released at the Base into groundwater and surface water. To do this work, the City incurred substantial costs to hire consultants with the necessary expertise to (a) design and plan the installation of the new monitoring wells, and (b) evaluate the sampling and pumping data, and (c) do gradient and fate-and-transport modeling of the groundwater. The City also paid outside contractors to install the new monitoring wells.

23.     The City also incurred substantial costs to employ outside labs to sample and analyze groundwater and finished water for PFAS. Because at the time PFAS was an emerging contaminant without well-established, U.S. EPA-approved sampling protocols and analytical test methods until sometime in the past two years, the City incurred extraordinary costs to use labs with the special expertise to do such sampling and analysis.

24.     In an effort to curb ever-increasing outside lab costs, the City also incurred substantial costs to upgrade its on-site laboratory staffing, expertise and equipment to be able to do more PFAS sampling and analysis in-house, becoming the first municipal lab in Ohio to obtain certification from

Ohio EPA to analyze PFAS.

25.     As another consequence of the PFAS release at the Base, the City incurred substantial costs to hire a consultant to design and implement a pumping/blending program using production wells still in operation at the Mad River wellfield, blended with water pumped from wells located in the City's Miami River wellfield, in order to reduce PFAS levels in water entering the Ottawa treatment plant.

26.     Additional emergency costs incurred by the City include hiring consultants and outside legal counsel to assist with (a) creating a dedicated page on the City's website with PFAS health advisories, sampling data, and action steps undertaken and planned by the City to keep its residents, businesses and contact customers fully apprised of the situation; (b) conducting and evaluating studies for alternative locations to site a new wellfield and treatment options to remove PFAS from the water; (c) providing technical and legal consultation to the City's Water Department to deal with the contamination and assist in numerous meetings with representatives of WPAFB, Ohio EPA and U.S. EPA to address the contamination and seek financial assistance with ongoing emergency measures; and (d) advocating to state and federal elected and appointed officials to assist in convincing WPAFB to take emergency steps to stop the PFAS release from continuing to enter the City's wellfield, and secure funding from Congress to treat the City's drinking water.

27.     All of the aforementioned emergency response measures were taken, and associated costs incurred, by the City of Dayton at the request, recommendation or concurrence of Ohio EPA, with full knowledge and concurrence on the part of U.S. EPA, and with full knowledge of, and absent any objection from, WPAFB.  These communications occurred in countless emails and written correspondence, in monthly technical meetings, and in regular Environmental Restoration Advisory Board meetings, starting from mid-2016 and continuing through the date of filing of this Complaint.

In addition, the City's residents, businesses and contract customers were kept informed of these steps in the City's dedicated PFAS webpage and, in some cases, in written correspondence and meetings.

28.     All of the aforementioned emergency response measures and associated costs are ongoing and totaled more than $14 million as of the February 25, 2025, date of the City's cost-recovery demand letter sent to WPAFB.

29.     Despite undertaking these emergency measures, *finished* water from the City's Ottawa treatment plant has consistently been, and remains today, three to four times above U.S. EPA's new drinking water standards for PFAS that go into effect in June 2029.  Perhaps more ominous is the fact that data collected from the City's monitoring wells just upstream of production wells in the Mad River wellfield continue to shows PFAS concentrations migrating from Area A at WPAFB into the City's wellfield as high as ***several hundred times*** more than the new drinking water standards, *indicating the presence of a massive PFAS plume* that will not subside or decrease anytime in the foreseeable future, thus requiring treatment of groundwater to remove PFAS.

## JURISDICTION, VENUE, AND WAIVER OF IMMUNITY

30.     Pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 9613(b) and 9659(a), this Court has jurisdiction over the City of Dayton's CERCLA claims.  Pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 300j-8(a), this Court has jurisdiction over the City of Dayton's SDWA claims.

31.     Pursuant to 28 U.S.C. § 1402(b) and S.D. Ohio Civil R. 82.1, venue is proper in this Court because the City resides in this judicial district, and because the acts and omissions alleged herein occurred in this judicial district.

32.     Pursuant to 42 U.S.C. § 9620(a)(1) (CERCLA) and 42 U.S.C. § 300j-6 (SDWA), Congress has expressly waived immunity on the part of the United States, including the DOD and its branches, from all applicability and compliance obligations of CERCLA and the SDWA.

## FIRST CLAIM FOR RELIEF
### (CERCLA Section 107 Cost-Recovery)

33.     The City incorporates by reference herein allegations 1 through 32 of this Complaint, as well as all terms and conditions, statements of fact, and allegations set forth in enclosed Exhibits A through D.

34.     The family of per- and poly-fluoroalkyl-based substances (PFAS) include perfluorooctanoic acid ("PFOA") and Perfluorooctanesulfonic acid ("PFOS"). In a final rule issued in the Federal Register on May 8, 2024 (89 Fed. Reg. 39124) (codified at 40 C.F.R. Part 302), U.S. EPA designated PFOA and PFOS, the two most widely used PFAS, as "hazardous substances" under 42 U.S.C. §§ 9601(14) and 9602(a) of CERCLA.

35.     PFOA and PFOS are the two PFAS found in all, or at least nearly all, of the samples of groundwater and drinking water obtained by, or on behalf of, the City since 2016 in monitoring and production wells in the Mad River wellfield, and in raw and treated water at the Ottawa water treatment plant. Based on data provided by, or otherwise made available by, WPAFB over this same time period, PFOA and PFOS are the two PFAS found in all, at least nearly all, of the samples obtained by, or on behalf of, the Base of soils, sediments, groundwater, and surface waters at, under, and flowing from the Base's property.

36.     WPAFB is the owner or operator of a "facility," as defined under CERCLA Section 101(9), 42 U.S.C. § 9601(9), from which a "release," as defined under CERCLA Section 101(22), 42 U.S.C. § 9601(22), of "hazardous substances" (i.e., PFOA and PFOS) has occurred.

37.     Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), the release of hazardous substances at WPAFB caused Dayton to incur "response" costs, as defined under CERCLA Section 101(25), 42 U.S.C. § 9601(25). Dayton is a "person," as defined under CERCLA Section 101(21), 42 U.S.C. § 9601(21).

38.     Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), the response costs incurred by the City, including past, ongoing and future costs, are necessary response costs incurred consistent with the National Contingency Plan, codified at 40 C.F.R. Part 300.

39.     Under CERCLA Section 107(a), 42 U.S.C. § 9607(a), WPAFB is liable for the City's response costs incurred due to the release of PFAS at the Base, including payment of interest on all costs deemed recoverable, as well as future response costs incurred by the City to address the contamination of its water supply.

40.     Under cover letter dated February 25, 2025, the City submitted a cost-recovery demand to WPAFB, including therewith documentation of more than $14 million in response costs incurred as of that date to respond to the release of PFAS at WPAFB and contamination of the City's wellfield and water supply.  WPAFB did not respond to the City's letter, which letter establishes the City's right to recover prejudgment interest on its unreimbursed costs.

## SECOND CLAIM FOR RELIEF
### (CERCLA Section 113 Declaratory Relief)

41.     The City incorporates by reference herein allegations 1 through 40 of this Complaint, as well as all terms and conditions, statements of fact, and allegations set forth in enclosed Exhibits A through D.

42.     Under CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), Dayton's cost-recovery claim is the initial action for the recovery of response costs.  In such action, the Court is required to enter a declaration of WPAFB's liability that will be binding in any subsequent action by the City to recover additional response costs caused by the Base's release of PFAS.

43.     Dayton requests that the Court enter such declaration against WPAFB for the City's future response costs.

**THIRD CLAIM FOR RELIEF**
**(CERCLA Sections 120 and 310 Injunctive Relief and Civil Penalties)**

44.     The City incorporates by reference herein allegations 1 through 43 of this Complaint, as well as all terms and conditions, statements of fact, and allegations set forth in enclosed Exhibits A through D.

45.     The FFA (Exhibit C) signed by WPAFB in March 1991 contained several binding commitments by WPAFB to address actual or threatened contamination of water supplies caused by contamination emanating from the Base.  For example:

> (f) Either Party may determine that there may be an endangerment to the public health or welfare, or the environment because of an actual or threatened release of a hazardous substance, contaminant, or pollutant at or from the site, including but not limited to discovery of contamination of a drinking water well at concentrations that exceed any State or federal drinking water action level or standards.  The Air Force agrees to take such response actions as may be necessary to abate such danger or threat, and to protect public health or welfare, or the environment.

(Exhibit C, FFA, at p. 38)

46.     This commitment was not limited to contamination of drinking water wells on the Base's property, but included "any area off WPAFB to or under which a release of hazardous substances, pollutants, or contaminants has migrated, or threatens to migrate, from a source on or at WPAFB."  (*Id*. at p. 8)

47.     WPAFB also committed in the FFA to (a) "expedite the cleanup process to the extent consistent with protection of human health and the environment" (*Id*. at p. 2); (b) "carry out all activities under the FFA so as to protect the public health, welfare and the environment" (*Id*. at p. 14); and (c) "timely request"…"sufficient funding though the DOD budgetary process to fulfill its obligations under the FFA." (*Id*. at pp. 13, 50) The Base also agreed that its failure to timely request funding to meet its obligations under the FFA would not be a force majeure defense to its failure to

14

meet its obligations under the FFA. (*Id*. at p. 36)

48. WPAFB also agreed to comply with all applicable requirements of CERCLA's NCP. (*Id*. at pp. 13, 37) These requirements include (a) prioritizing responses to releases that may present an imminent and substantial danger to public health or welfare (40 C.F.R. § 300.3); and (b) complying with all applicable USAF directives (40 C.F.R. § 300.170), which includes USAF Directive 32-70, issued on July 20, 1994, containing the following commands:

> 1.3.1. Cleanup. The Air Force will reduce health and environmental risks created or caused by past operations. At each installation, the Air Force will move as rapidly as possible to identify, characterize, and clean up contamination. The Air Force will ensure open, unbiased, and comprehensive processes for cost-effective cleanup and protection of human health and public well-being by involving the public and regulatory agencies in the clean-up activities. At locations in foreign countries, the Air Force will restore sites contaminated by Air Force activities to sustain current operations and eliminate known imminent and substantial dangers to human health and safety.

> 1.4. The Air Force will seek sufficient funding to carry out all environmental activities needed to meet its legal obligations. All funds appropriated by the Congress for these activities will be administered responsibly.

(Directive 32-70 at pp. 1-2, available at https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/Attachments%20By%20ParentFilingId/968D1 EE4ADDBD81985257CBA005933DB/$FILE/Attachment%209%20- %20Air%20Force%20Policy%20Directive%2032-70.pdf, last visited 12/22/25)

49. Other obligations of the NCP incorporated into the FFA included (a) engaging in prompt hazardous substance response and being sensitive to local community concerns when a response requires federal funding (40 C.F.R. § 300.400(c)); and (b) perhaps most importantly, undertaking as soon as possible an emergency removal and/or remedial action, backed up, if time permits, by a site assessment, investigation and feasibility review, "to abate, prevent, minimize, stabilize, mitigate or eliminate [a] threat to public health or welfare of the United States or the environment," and "mak[ing] any necessary determinations"…"as soon as possible," to meet this requirement, with emphasis on taking these steps when information showed "***actual or potential contamination of drinking water supplies***." (40 C.F.R. §§ 300.410, 300.415)(emphasis added) And

when an emergency removal and/or remedial action is needed to address a contaminated water supply, the NCP provides further that the response actions that must be considered include treatment of groundwater to eliminate or reduce human exposure, and provision of an alternative water supply. (40 C.F.R. § 300.415)  All of these obligations were incorporated into the March 1991 FFA that WPAFB signed.  (Exhibit C, FFA, at pp. 13, 37)

50.    The fact that these detailed obligations were specifically intended to protect the City of Dayton's water supply could not have been clearer, as the FFA contains the following statement of fact:

(b)  WPAFB overlies a portion of the Miami Buried Valley Aquifer which is the source of potable water for WPAFB and the Cities of Dayton and Fairborn.  The Miami Buried Valley Aquifer consists generally of upper and lower sand and gravel water bearing zones in which the potential for migration of contamination to area aquifers is high due to their characteristic high permeabilities and transmissivities.

(*Id.* at p. 9)

51.    Finally, the FFA contained a clear and unequivocal statement of the City's right to enforce its terms under Section 310 of CERCLA, which is its citizen-suit provision:

(a)  Upon the effective date of this Agreement, any standard, regulation, condition, requirement or order which has become effective under CERCLA and is incorporated into this Agreement is enforceable by any person pursuant to Section 310 of CERCLA, and any violation of such standard, regulation, condition, requirement or order will be subject to civil penalties under Sections 310(c) and 109 of CERCLA;

* * * *

(c)  All terms and conditions of this Agreement associated with removal actions and interim and/or final remedial actions, including corresponding timetables, deadlines or schedules, and all work associated with the removals and interim and/or final remedial actions, shall be enforceable by any person pursuant to Section 310(c) of CERCLA, and any violation of such terms or conditions will be subject to civil penalties under Sections 310(c) and 109 of CERCLA; and

(*Id.* at pp. 46-47)

52. As required by Section 310 of CERCLA, 42 U.S.C. § 9659, Dayton's June 3, 2025, letter (Exhibit D) notified WPAFB of its specific and ongoing violations of the FFA, as well as its specific and ongoing violations of the NCP incorporated into the FFA. More than 60 days have passed since the notice was issued, and neither Ohio EPA nor U.S. EPA has commenced diligent enforcement to address WPAFB's violations. WPAFB's violations are continuing today.

53. Pursuant to Sections 120 and 310 of CERCLA, 42 U.S.C §§ 9629 and 9659, the City is entitled to injunctive relief ordering WPAFB to take all of the steps required in the FFA and CERCLA's NCP to eliminate and otherwise remediate the PFAS contamination of the City's water supply, including, but not limited to, immediately requesting from Congress the funding necessary to design and install treatment to remove PFAS from the City's finished water, and the funding necessary to design and install a new or expanded groundwater treatment system on the Base's property to mitigate/reduce the massive PFAS groundwater plume that continues to migrate from the Base into the City's wellfield. The City also requests that the Court issue an order imposing civil penalties against WPAFB for each day it has violated, and continues to violate, the terms of the March 1991 FFA.

## FOURTH CLAIM FOR RELIEF
### (SDWA Sections 1447 and 1449 Injunctive Relief and Civil Penalties)

54. The City incorporates by reference herein allegations 1 through 53 of this Complaint, as well as all terms and conditions, statements of fact, and allegations set forth in enclosed Exhibits A through D.

55. As noted above, in Dayton's March 31, 2021, letter (Exhibit A) to WPAFB, the City put the Base on notice of numerous ongoing violations of multiple federal environmental statutes, including the SDWA. (*Id*. at pp. 19-20) Among these violations were WPAFB's failure to comply with compliance orders dated June 2, 2016, June 20, 2016, and January 29, 2018, issued by Ohio

EPA under, *inter alia*, the authority in Ohio's delegated SDWA program. (*Id.*)

56.     For example, in its June 2 and 20, 2016, letters, Ohio EPA directed WPAFB to undertake "an expedited removal action…to ensure that PFAS detected in ground water at the Base are prevented from affecting…the downgradient City of Dayton production wells." (*Id.* at pp. 6-7) The June 20, 2016, letter further added:

> The activities outlined in this letter…are paramount to protecting Dayton's drinking water supply. Ohio EPA has diligently worked with you in an attempt to reach agreement on a reasonable schedule for the work which is protective of the Dayton drinking water supply. It appears, despite our best efforts, you have not been willing to commit to the removal activities…Please be advised that…Ohio EPA will pursue all legal actions available to it to ensure citizens are safe. Legal actions may include, but are not limited to, administrative orders and/or coordination with the Ohio Attorney General to pursue judicial remedies.

(*Id.* at p. 7)

57.     When WPAFB continued to not comply with Ohio EPA's 2016 orders, the Agency issued a third order dated January 29, 2018, this time including a notice of violation and, for the second time, directing WPAFB to take action to submit a workplan within 30 days to: (a) "initiate source removal from known areas of soil and sediment [PFAS] contamination…to terminate leaching to ground water;" (b) "initiate an engineering study to determine the most effective way to prevent additional PFAS contamination from migrating beyond the WPAFB boundary…includ[ing] increased pumping to augment [WPAFB's] current [VOC capture system], install[ing]…additional extraction wells, or using existing production wells to prevent further migration downgradient;" (c) "evaluate storm water discharge locations…to determine if the[y] may also be a…source…that could impact…the City of Dayton production wells [and] [i]f they are…implement actions to prevent this impact;" and (d) evaluate long-term actions so that Dayton's…Huffman Dam wellfield and the Ottawa Drinking Water Plant are no longer impacted…." (*Id.* at pp. 9-10)

58.     In the January 29, 2018, letter, the Director of Ohio EPA characterized WPAFB's failures as follows:

While WPFAB has developed a sentinel monitoring well network and continues to monitor the ground water, WPAFB has not taken any steps to prevent PFAS contamination present at WPAFB from migrating beyond your boundary, nor evaluated any actions that could prevent surface water contamination present at WPAFB from impacting the city of Dayton's Mad River drinking water wellfield. Further, you have taken no action to prevent further impacts to WPAFB's Area B water supply. Adding to this list of issues, we now know that PFAS contamination has been detected in the raw water at Dayton's Ottawa Drinking Water Treatment Plant. This plant is directly in the migration path of contaminated ground water emanating from WPAFB.

This lack of urgency to take additional appropriate action is very concerning. And while we wish to continue to work collaboratively with WPAFB on a solution, I feel compelled to require immediate action on your part to protect the ground water, which is also the primary source of drinking water not just for WPAFB, but for 1.5 million people that live in and around the city of Dayton.

Specifically, I find it appropriate to hold WPAFB in violation of Chapter 6111.04 of the Ohio Revised Code (ORC), which states in pertinent part:

> (A)••• (1) No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state.
>
> (2) Such an action prohibited under division (A)(1) of this section is hereby declared to be a public nuisance."

(*Id*. at p. 10)

59.     WPAFB never undertook the emergency relief ordered by Ohio EPA in the three letters issued by the Agency in 2016 and 2018 to stop the ongoing migration of the PFAS-contaminated groundwater into Dayton's wellfield, leaving the City to fend for itself without any financial or technical assistance forthcoming from the Base.

60.     The State of Ohio has been delegated primacy from U.S. EPA to run the federal SDWA program in Ohio since at least the mid to late 1970s. Among other outcomes of such delegation, orders issued by Ohio EPA under its delegated SDWA state program are federally enforceable under the citizen-suit provision in the SDWA.

61.     As required by Section 1449 of the SDWA, 42 U.S.C. § 300j-8, Dayton's March 31, 2021, letter (Exhibit A) notified WPAFB of its specific and ongoing violations of Ohio EPA's orders, and that fact that they were enforceable orders under the federal SDWA. (Exhibit A, at pp. 19-20) More than 60 days have passed since the notice was issued, and neither Ohio EPA nor U.S. EPA has commenced diligent enforcement to address WPAFB's violations of Ohio EPA's orders. WPAFB's violations of these orders are continuing today.

62. Pursuant to Sections 1447 and 1449 of the SDWA, 42 U.S.C §§ 300j-6 and 300j-8, the City is entitled to injunctive relief ordering WPAFB to take the steps required in the compliance orders issued by Ohio EPA to the Base to stop the migration of PFAS-contaminated groundwater into the City's wellfield and water supply. The City also requests that the Court issue an order imposing civil penalties against WPAFB for each day it has violated, and continues to violate, the terms of Ohio EPA's compliance orders.

## FIFTH CLAIM FOR RELIEF
### (SDWA Sections 1447 and 1449 Injunctive and Declaratory Relief and Civil Penalties)

63. The City incorporates by reference herein allegations 1 through 62 of this Complaint, as well as all terms and conditions, statements of fact, and allegations set forth in enclosed Exhibits A through D.

64. Under the SDWA, U.S. EPA's agreement to designate the aquifer that supplies Dayton's drinking water as a sole source aquifer required that the City develop, implement, and enforce a comprehensive aquifer management plan, wellfield/source protection plan, and wellfield protection ordinance ("WPO") to control surface activities that might contaminate the aquifer. *See* 42 U.S.C. § 300h-6(e)–(f). Dayton complied with this federal requirement. *See* Dayton Municipal Ordinance Title 5, Chapter 53, §§ 53.01-53.99. (available at https://library.municode.com/oh/dayton/codes/code_of_ordinances?nodeId=TITVPUUT_CH53PU WASUPO_DIV3AD, last accessed 12/22/25). Dayton's WPO is an enforceable obligation under the SDWA.

65. Under Dayton's wellfield protection program, operations at WPAFB Areas A and B are located partly inside the 1-year, and partly inside the 5-year, time of travel boundaries for the City's Mad River wellfield, which are groundwater contour lines that establish zones in which restrictions under the WPO are imposed to minimize the risk of contaminating groundwater, as well

as remedial obligations and cost recovery in the event of contamination occurs. Since at least the late 1980s WPAFB has known about the City's wellfield protection program, that operations at the Base were located inside the aforementioned time of travel protection zones and thus had the potential, if not properly managed, to contaminate the aquifer that provides the sole source of water for Dayton's drinking water, and that therefore the Base's operations were subject to the City's WPO.

66.    Under the City's WPO, WPAFB is required to (a) comply with the planning, handling, inventory and reporting obligations thereunder designed to minimize the risk of a regulated substance contaminating the City's sole source aquifer; (b) notify the City immediately upon knowledge of a release of a regulated substance that might contaminate the aquifer; and (c) if a release has occurred, implement steps within 180 days to address the release and eliminate the risk of recurrence. The WPO also prohibits the Base from handling any regulated substance in a manner inconsistent with the purpose and scope of the ordinance. The WPO also provides that any person responsible for the release of a regulated substance is liable for the costs incurred by the City to investigate, sample, and remediate the release, and take steps to protect the City's water supply.

67.    After discovering widespread PFAS contamination at the Base in 2015, including contamination of groundwater, WPAFB unilaterally notified the City in a letter dated December 20, 2016, that the Base would no longer comply with the City's WPO, which had been enforced at the Base for 25 consecutive years in a detailed Memorandum of Understanding executed by the City and Base. WPAFB had no authority under the SDWA, or elsewhere, to make this decision.

68.    As noted above, in Dayton's March 31, 2021, letter (Exhibit A) to WPAFB, the City put the Base on notice of numerous ongoing violations of multiple federal environmental statutes, including the SDWA. (*Id*. at pp. 19-20) Among WPAFB's SDWA violations was the Base's failure to comply with the City's WPO. (*Id*.) WPAFB took no steps to comply with the City's WPO, which

violations continue today. More than 60 days have passed since the notice was issued to WPAFB, and neither Ohio EPA nor U.S. EPA has commenced diligent enforcement to address WPAFB's ongoing violations of the City's WPO.

69.     Pursuant to Sections 1447 and 1449 of the SDWA, 42 U.S.C §§ 300j-6 and 300j-8, the City is entitled to injunctive relief ordering WPAFB to take the steps required to comply with the City's WPO, including (a) pumping and treating the contaminated groundwater so that it stops migrating into the City's wellfield, and (b) reimbursing the costs incurred by the City to investigate, sample, and take emergency steps due to the release of PFAS at the Base and resulting contamination of the aquifer that supplies Dayton's drinking water. The City also requests that the Court issue a declaration that WPAFB is liable under the WPO for the City's future response costs, and issue an order imposing civil penalties against WPAFB for each day it has violated, and continues to violate, its requirements of the City's WPO.

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing claims, the City of Dayton requests that the Court grant the City the following relief:

1.     Enter a judgment ordering WPAFB to reimburse all response costs incurred by the City as a result of WPAFB's release of PFAS to the environment and the ensuing contamination of the City's water supply, including payment of prejudgment interest dating from the February 25, 2025, date of the City's written cost-recovery demand letter;

2.     Enter a judgment declaring that WPAFB is liable for reimbursement to the City for its future response costs incurred after February 25, 2025, due to the release of PFAS to the environment and the ensuing contamination of the City's water supply, including, but not limited to, the cost of constructing and operating a treatment system at the City's water treatment plant to remove PFAS sufficient to meet U.S. EPA's new drinking water standards;

22

3.     Enter an injunction ordering WPAFB to take the steps required under the March 1991 FFA, including those in CERCLA's NCP incorporated therein, to address and remediate the PFAS contamination of the City's water supply, and stop the ongoing migration of PFAS-contaminated groundwater into the City's wellfields, and issue an order imposing civil penalties for the Base's past and ongoing violations of the March 1991 FFA;

4.     Enter an injunction ordering WPAFB to take the steps required under the compliance orders issued to the Base by Ohio EPA in 2016 and 2018, in order to remediate the PFAS contamination of the City's water supply and stop the ongoing migration of the contamination into the City's wellfield, and issue an order imposing civil penalties for the Base's past and ongoing violations of Ohio EPA's compliance orders;

5.     Enter an injunction ordering WPAFB to (a) take the steps required under the City's WPO to remediate the PFAS contamination of the City's water supply and stop the ongoing migration of the contamination into the City's wellfield, and (b) reimburse the City's response costs, and issue an order imposing civil penalties for the Base's past and ongoing violations of Dayton's WPO;

6.     Enter a judgment declaring that WPAFB is liable under the City's WPO for reimbursement of the City's future response costs incurred after February 25, 2025, due to the release of PFAS to the environment and the ensuing contamination of the sole source aquifer and the City's water supply, including, but not limited to, the cost of constructing and operating a treatment system at the City's water treatment plant to remove PFAS sufficient to meet U.S. EPA's new drinking water standards; and

7.     Award legal fees and expenses, including any Court fees or expenses, to the City under the citizen-suit provisions of the SDWA and CERCLA, 42 U.S.C §§ 300j-8, and 9659,

respectively, for the City prosecution of WPAFB's violations of these two federal statutes; and

8.      Award the City such other relief as the Court deems just and proper.

Respectfully submitted,

*ss//Stephen N. Haughey*
Stephen N. Haughey (Bar No. 0010459) (Trial Counsel)
**FBT GIBBONS LLP**
301 E. Fourth Street, Suite 3300
Cincinnati, Ohio 45202
(513) 651-6800
shaughey@fbtgibbons.com
*Counsel for Plaintiff City of Dayton, Ohio*

**CO-COUNSEL:**
John C. Musto (Bar No. 0071512)
Deputy Director, City of Dayton Department of Law
101 West Third Street
Dayton, OH 45401
(937) 333-4116
john.musto@daytonohio.gov

0105357.0730840  4859-5738-8021v1